UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

GMAC RELOCATION SERVICES, INC.,

                              No. CV 06-887-MO

            Plaintiff,

                              OPINION & ORDER

    v.

JANE "JAMIE" M. HERRING & STEPHEN
G. HERRING,

           Defendants.

**MOSMAN, J.,**

In this diversity action, plaintiff GMAC Global Relocation Services, Inc. ("GMAC") mistakenly deposited $291,765.85 into Stephen and Jamie Herring's joint bank account. After the money was not returned, GMAC filed suit against the Herrings alleging conversion and unjust enrichment. Ms. Herring has not yet been served. Mr. Herring argues Ms. Herring withdrew the wrongly deposited money from the joint account without his knowledge or permission, and therefore, GMAC has no claim against him. GMAC now moves for summary judgment against Mr. Herring. For the reasons that follow, GMAC's motion (#19) is DENIED.

## BACKGROUND

Viewed in the light most favorable to the non-movant, here Mr. Herring, the facts reveal as follows. *Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005). GMAC was hired by Mr. Herring's employer, ConocoPhillips, to relocate Mr. Herring from Oregon to Texas. Mr. Herring and his three children moved to Texas; however, Ms. Herring stayed in Oregon and filed for divorce. As part of its relocation services, GMAC paid the Herrings over $200,000 for

the equity in their home and proceeded to sell the home to a third-party buyer. The Herrings received the money for their home in February 2006.

GMAC was successful in finding a buyer for the Herrings' home. Then, on March 23, 2006, instead of wiring the $291,765.85 received from the buyer to the mortgage holder, GMAC mistakenly wired these funds to the Herrings' joint account. Five days later, on March 28, Ms. Herring withdrew the mistakenly deposited funds and closed the joint account. S. Herring Aff. in Opp. Mot. Summ. J. at 2, Ex. 1. GMAC contacted Mr. Herring in May and informed him of its error. *Id.* at 2. Thereafter, Mr. Herring contacted his bank. The bank confirmed a $219,765.85 deposit was made into the joint account, but further related that the money had been withdrawn and the account closed. On May 31, as part of the Herrings' divorce proceedings, the state court entered an order finding Ms. Herring "has possession of funds that were mistakenly wire-transferred into her [account]." Mem. in Opp. Mot. Summ. J., Ex. 1 at 2.

After unsuccessfully attempting to reacquire the money, GMAC filed suit against the Herrings in June alleging conversion and unjust enrichment. GMAC served its complaint on Mr. Herring in July. On August 1, GMAC's counsel informed the court they were attempting to serve Ms. Herring but that she was "actively evading service." Letter from Counsel Dated Aug. 1, 2006. Counsel also states he spoke with Ms. Herring on the telephone and she "acknowledged that she has the money, but is unwilling to return it." *Id.*

## DISCUSSION

As stated above, GMAC moves for summary judgment against Mr. Herring on both of its claims. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of "pointing out" the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden is met by showing an absence of evidence to support the non-movant's case. *Id.* In order to defeat summary judgment, the non-moving party must then set forth "'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (citation omitted).

I.    Conversion

The Oregon Supreme Court defines conversion as the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 456 P.2d 1004, 1007 (Or. 1969). The seriousness of the alleged interference and the "justice of requiring the actor to pay the full value" is determined by considering the following factors:

> (a) The extent and duration of the actor's exercise of dominion or control;
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
> (c) the actor's good faith;
> (d) the extent and duration of the resulting interference with the other's right of control;
> (e) the harm done to the chattel;
> (f) the inconvenience and expense caused to the other.

*Id.*

Here, these factors do not establish as a matter of law that Mr. Herring converted GMAC's money. While it is true the money was deposited into an account in which Mr. Herring held a joint interest, Ms. Herring withdrew the money five days after it was deposited, before Mr. Herring even knew about GMAC's error. Thus, to the extent Mr. Herring had any control

over the money, it was minimal. Further, the facts suggest Mr. Herring has acted in good faith and that he does not intend to exercise any right or control over the money. Upon learning of GMAC's error, he received repayment forms from GMAC, which he forwarded to Ms. Herring. S. Herring Aff. in Opp. Mot. Summ. J. at 2. Likewise, he has contacted Ms. Herring, demanding she return GMAC's money. Answer at ¶ 5.

GMAC argues Mr. Herring is liable for Ms. Herring's actions because the money was deposited into their joint account. In support of this position, GMAC cites *Barnes v. Eastern & Western Lumber Co.*, 287 P.2d 929 (Or. 1955) (en banc). In *Barnes*, the Oregon Supreme Court quoted 58 C.J.S. Money Received § 23, p. 929, which states: "Where money is received on the joint account of several defendants they are jointly liable." *Barnes*, 287 P.2d at 954. However, it is clear from reading the *Barnes* opinion as a whole that before joint liability attaches, the defendant must have engaged in some wrongful activity. Each of the defendants in *Barnes* were involved in the wrongful activity, and the issue was whether they were required to make restitution for their specific share, or whether each defendant was liable for the entire amount the group wrongfully acquired. In summing up its view of joint liability, the court stated:

> The authorities which maintain that where there has been a division of the spoils a joint tort-feasor's liability in assumpsit is only several and is limited to the benefit which he kept, in our opinion, rests on too narrow an interpretation of the term 'benefit'. If each tort-feasor has possession of and exercises dominion and control, with his fellows, over the victim's property, he thereby uses and benefits from the whole. We believe that where joint tort-feasors divide the spoils, each, as regards liability, benefits to the extent of the entire amount which they wrongfully appropriated, even though the assets of each upon subsequent division are not in [sic] creased to an extent equal to the value of the whole. How the group eventually disposes of the property which was taken is immaterial. *It is the wrongful appropriation by the entire group of tort-feasors which creates the duty to return*.

*Id.* at 955 (emphasis added).

As discussed above, the facts do not establish, as a matter of law, that Mr. Herring

converted GMAC's money. And to the extent GMAC contends *Barnes* establishes some form of strict liability for joint account holders, this assertion is not supported by the court's holding. Rather, it is clear from the court's holding that joint liability was found, not because a joint account was involved, but because the defendants, as a group, acted wrongfully. To the extent the opinion speaks to joint liability of an *innocent* actor, it is dicta.

II.     Unjust Enrichment

GMAC also argues it is entitled to summary judgment against Mr. Herring on its unjust enrichment claim. To establish a claim for unjust enrichment, the plaintiff must show the defendant has (1) received a benefit, (2) which it is unjust for the defendant to retain. *Hitchcock v. Delaney*, 86 P.3d 73, 76 (Or. Ct. App. 2004). "A benefit received and retained can consist of any form of advantage and exists, for example, where one party adds to the property of another or saves another from expense or loss." *Id.* (citing Restatement (First) Restitution § 1 (1937)).

The facts of *Hitchcock* are instructive here. There, the plaintiff sought restitution for the amount it overpaid on a judgment to defendants. Defendant Dolphin Real Estate Group ("Dolphin") managed a mobile home park for plaintiff property owners. Defendant Delaney worked for Dolphin. When the property owners experienced some financial difficulty, they authorized Dolphin to borrow money to continue operating the mobile home park. Dolphin established a line of credit and gave as collateral the personal residence of three Dolphin employees, including Delaney. Ultimately, the property owners dismissed Dolphin as the property manager, and Dolphin & Delaney demanded the property owners repay the loans that were acquired on their behalf. The trial court entered judgment in favor of both defendants, and the property owners appealed.

On appeal, the court reduced the amount of the judgment and removed Delaney as a

judgment creditor. However, while the appeal was still pending, the property owners paid the judgment with three checks "made payable to Delaney, despite escrow instructions and a letter to [the owners] directing that they be made payable to Dolphin." *Id.* at 74. Upon receipt of the checks, Delaney immediately endorsed them over to Dolphin.

The property owners appealed a second time arguing they were entitled to recover the amount they overpaid on the judgment from Delaney and that the trial court erred in releasing him as a creditor for overpayment purposes. Specifically, they argued Delaney received a benefit for purposes of unjust enrichment simply by possessing the checks because they were made payable to him and at the time he received them he was a judgment creditor. *Id.* at 76. The Court of Appeals disagreed, stating:

> We agree with [the property owners] that the right and ability to cash the checks conferred some form of *potential* benefit on Delaney. But we disagree that any benefit, under the circumstances, actually resulted in unjust enrichment. The checks were made payable to Delaney in error. The error was not of Delaney's making. To the contrary, the attorney representing Delaney and the other defendants issued escrow instructions directing that the checks be made payable to Dolphin, rather than to Delaney. Under those instructions, Delaney was merely to take delivery of the checks on Dolphin's behalf. Delaney accepted delivery despite the fact that the checks were made payable to him in error, but he did not cash the checks, deposit the funds into his own bank account, or otherwise use them to his benefit. Rather, he immediately endorsed them over to Dolphin. . . . Thus, under the circumstances, the fact that the checks were made payable to Delaney did not result in either a realized benefit to him or an unjust one.

*Id.* The property owners also argued Delaney received a benefit to the extent Dolphin used the checks to pay the pay off the loans secured in part by Delaney's house. Without deciding whether this would result in a benefit to Delaney, the court rejecting this argument finding there was no evidence Dolphin used the check proceeds to pay off the loans. *Id.*

Finally, the property owners argued they were entitled to recover their overpayment from the person they paid without having to trace the funds to their ultimate location. *Id.* at 77. The

court agreed with this proposition in theory, but found that "this particular case d[id] not present a fund-tracing problem" because it was undisputed that Delaney "gave the funds in full to Dolphin, a party to the litigation." *Id.* Thus, the court found there was no inequity in requiring the property owners to seek recovery of their overpayment from Dolphin.

A similar result is dictated in this case, at least at this stage of the proceedings. GMAC argues Mr. Herring received a benefit because the money was mistakenly wired into his joint account and he could have accessed it. It further argues that "[a]lthough he had the opportunity to do so, [Mr.] Herring failed to return the Funds to [GMAC]. Mem. Supp. Summ. J. at 6. However, as discussed above, viewing the facts in the light most favorable to Mr. Herring, he was not aware of GMAC's mistake until well after Ms. Herring withdrew the money and closed the joint account. Likewise, there is no evidence Ms. Herring has used the money in a way that benefits Mr. Herring. Thus, as in *Hitchcock*, though he had the *potential* to receive a benefit, he did not realize any benefit, unjust or otherwise. *Id.* at 76.

Further, it appears there is no funds-tracing problem here. Ms. Herring withdrew the mistaken deposit, and the state court found she is in possession of these funds. Thus, it does not appear equity demands GMAC be able to recover its loss from Mr. Herring.

For the foregoing reasons, GMAC's motion for summary judgment (#19) is DENIED. IT IS SO ORDERED.

DATED this  30th  day of November, 2006.

                                      /s/ Michael W. Mosman
                                      MICHAEL W. MOSMAN
                                      United States District Court